FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA   2015 MAR 20  PM 12: 02

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| ELIZABETH AMES AND BARBARA BADER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHEM, INC., D/B/A ANTHEM HEALTH, INC., THE ANTHEM COMPANIES, INC., D/B/A BLUE CROSS BLUE SHIELD OF WISCONSIN, HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, BLUE CROSS BLUE SHIELD OF ARIZONA, INC., <br><br> Defendants. | <u>**CLASS ACTION COMPLAINT**</u> <br><br> <u>**DEMAND FOR JURY TRIAL**</u> <br><br> Case No. <br><br> **1 : 15 -cv- 0 4 6 5 SEB -TAB** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs ("Ames and Bader" or "Plaintiffs") allege the following, upon personal knowledge with respect to themselves, and on information and belief derived from, among other things, investigation of counsel and review of public documents, as to all other matters:

### <u>NATURE OF THE CASE</u>

1.      This is a class action on behalf of the millions of customers of Anthem Health, The Anthem Companies, Inc., d/b/a Blue Cross Blue Shield of Wisconsin ("BCBSWi") (collectively "Anthem"), and Blue Cross Blue Shield of Arizona and Horizon Blue Cross Blue Shield of New Jersey (collectively, with Anthem, "Defendants") whose personal health information ("PHI") and/or personally identifiable information ("PII") were disclosed to one or more criminal actors in what is the largest consumer data security breach in the medical insurance industry's history.  Plaintiffs seek relief under Indiana law on behalf of all consumers in the United States who had their PHI and/or PII stolen as a result of the breach.  Plaintiffs also

seek relief under New Jersey and Wisconsin law, respectively, on behalf of the millions of customers of Anthem in New Jersey and Wisconsin who had their PHI and/or PII stolen.

2.     Anthem is the second largest health insurer in the United States, and the largest for-profit managed health care company in the Blue Cross and Blue Shield Association.

3.     On February 4, 2015, Anthem announced that hackers had breached its systems and stolen personal and financial information of up to 80 million Anthem health insurance plan customers, former customers, and employees.

4.     Anthem has yet to individually notify its customers what specific data of theirs had been stolen, telling them that such notification may take weeks.  It has nevertheless advised that the data stolen included names, birthdates, email addresses, employment details, Social Security numbers, incomes, and street addresses.

5.     This theft occurred because of Anthem's failure to take reasonable measures to ensure its data systems were adequate to protect the sensitive personal data of its customers and former customers. Among other things, Anthem failed to implement data security measures designed to prevent this attack despite repeated warnings to the healthcare industry and Anthem about the risks of such cyber attacks, failed to employ security protocols to detect the unauthorized network activity, failed to maintain basic security measures such as complex data encryption so that if data were accessed or stolen it would be unreadable, failed to disclose to its customers the material facts that it did not have adequate computer systems and data security practices to safeguard customers' personal data, and failed to provide immediate and accurate notice of the data breach to its customers. These failures have injured Plaintiffs and the Class.

6.     Within the past 10 years, Plaintiffs have sought and received treatment in states where the Blue Cross Blue Shield Network is administered by Anthem.   Like millions of other Anthem customers, Plaintiffs' PHI and/or PII has been stolen.

7.     Because of Defendants' negligence, some 80 million customers had their personal information, including names, birthdates, email addresses, employment details, Social Security numbers, incomes, and street addresses, stolen by criminal hackers.

8.     The information obtained as a result of the conduct complained of herein is a treasure trove for identity thieves who use it to gain access to every aspect of a victim's life, or worse, to create a new life using the victim's identity for years to come.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332 (a) and 1332 (d), because the amount in controversy exceeds $5,000,000.00 exclusive of interests and costs, and more than two-thirds of the members of the Class are citizens of states different from that of Defendants.

10.     Venue lies in this Court pursuant to 28 U.S.C. § 1391 because many of those affected by Defendants' wrongful conduct reside in this District and many of the potential witnesses reside and work in this District.   Moreover, Anthem maintains its headquarters, and operates its national business from this District.

## THE PARTIES

11.     Plaintiff Ames is a citizen of New Jersey and, upon information and belief and Anthem's statements to its customers as a whole, had at least her PII and possibly PHI stolen as a result of the Anthem data breach.

12.     Plaintiff Bader is a citizen of Wisconsin and, upon information and belief and Anthem's statements to its customers as a whole, had at least her PII and possibly PHI stolen as a result of the Anthem data breach.

13.     Defendant Anthem, Inc., doing business as Anthem Health, Inc., is an Indiana corporation, and headquartered in Indianapolis, Indiana.

14.     Defendant The Anthem Companies, Inc. is an Indiana corporation, headquartered in Indianapolis, Indiana.

15.     Blue Cross Blue Shield of Wisconsin is a Wisconsin corporation, headquartered in Milwaukee, Wisconsin.

16.     Horizon Blue Cross Blue Shield of New Jersey is a New Jersey non-profit health service corporation, headquartered in Newark, New Jersey.

17.     Blue Cross Blue Shield of Arizona, Inc. is an Arizona Corporation headquartered in Phoenix, Arizona.

18.     Collectively, the Defendants, all closely linked and intertwined businesses, are responsible for the retention, storage, and protection of Plaintiffs' and Class members' PHI and PII.

## FACTUAL ALLEGATIONS

19.     Anthem is one of the largest for-profit managed health care companies in the United States. Anthem has an obligation to maintain the security of their health plan customers' and former customers' personal, health, and financial information, and to immediately and accurately notify them of a breach of its systems to protect them, and to allow them to protect themselves, from identify theft and other misuse of their personal data.

20.     Anthem's Notice of Privacy Policy, provided to customers as part of their health insurance agreement, states the steps Anthem takes to protect customers' PHI:

> We keep the health and financial information of our current and former members private, as required by law, accreditation standards and our rules.
>
> We are dedicated to protecting your PHI, and have set up a number of policies and practices to help make sure your PHI is kept secure. We keep your oral, written and electronic PHI safe using physical, electronic, and procedural means. These safeguards follow federal and state laws. Some of the ways we keep your PHI safe include securing offices that hold PHI, password protecting computers, and locking storage areas and filing cabinets.

21.    Anthem's website also contains the following privacy policy, which acknowledges the sensitive nature of the information that was stolen and acknowledges its commitment to safeguard such information:

> Your privacy is very important to us and we will make every reasonable effort to safeguard any information we collect.
>
> Personal Information (including Social Security Number) Privacy Protection Policy Anthem Blue Cross and Blue Shield maintains policies that protect the confidentiality of personal information, including Social Security numbers, obtained from its members and associates in the course of its regular business functions. Anthem Blue Cross and Blue Shield is committed to protecting information about its customers and associates, especially the confidential nature of their personal information (PI).
>
> Personal information is information that is capable of being associated with an individual through one or more identifiers including but not limited to, a Social Security number, a driver's license number, a state identification card number, an account number, a credit or debit card number,...or a health insurance identification number....
>
> • Anthem Blue Cross and Blue Shield is committed to protecting the confidentiality of Social Security numbers and other Personal Information.
>
> • Anthem Blue Cross and Blue Shield's Privacy Policy imposes a number of standards to:
>
>> • guard the confidentiality of Social Security numbers and other personal information,

5

- prohibit the unlawful disclosure of Social Security numbers, and

- limit access to Social Security numbers.

Anthem Blue Cross and Blue Shield will not use or share Social Security numbers or personal information with anyone outside the company....

Anthem Blue Cross and Blue Shield safeguards Social Security numbers and other personal information by having physical, technical, and administrative safeguards in place.

22.     The Health Insurance and Portability and Accountability Act ("HIPAA"), and implementing regulations, require Anthem to establish procedures to keep confidential and private PHI and PII it maintains on enrollees and members, including without limitation, names and Social Security numbers. 45 C.F.R. § 164.530(c)(1) requires healthcare providers, including Anthem, to implement reasonable safeguards for such information, which Anthem failed to do. 45 C.F.R. § 164.404 requires that companies provide notice of the breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons — i.e., non-encrypted data. *See* C.F.R. § 164.402. Anthem failed to provide such notice.

23.     Plaintiffs have health insurance issued by Blue Cross Blue Shield of Arizona, and Horizon Blue Cross Blue Shield of New Jersey, respectively; as such Anthem has required that they provide their PII and PHI to Anthem. Plaintiffs, therefore, provided it, believing it to be safe.

24.     The 37 local member companies of the Blue Cross Blue Shield Association, including Blue Cross Blue Shield of Arizona, and Horizon Blue Cross Blue Shield of New Jersey are the primary points of contact for members. They are responsible for processing claims and providing customer service.

25.     This is not the first time that Anthem has failed to adequately protect consumers' personal data.  In July 2013, WellPoint, Inc. ("WellPoint"), the corporate name under which Anthem previously did business, agreed to pay $1.7 million to the U.S. Department of Health and Human Services for potential violations of HIPPA's Privacy and Security Rules.

26.     Specifically, the government found that WellPoint's database failed to adequately protect the PHI of 612,402 customers.

27.     In 2012, Anthem Blue Cross settled claims by the California Attorney General that it had sent letters to 30,000 customers with their Social Security numbers clearly visible through the transparent window on the envelopes.

28.     In 2013, Anthem posted the Social Security or tax identification numbers for over 24,000 California doctors in its online provider directory.

29.     As noted by Paul Stephens, director of policy and advocacy at the Privacy Rights Clearinghouse, "Anthem does not have a very good track record of protecting the information entrusted to them." Chad Terhune, Anthem hack raises fears about medical data, L.A. TIMES (Feb. 5, 2015), http://www.latimes.com/business/la-fi-anthem-hack-fallout-20150206-story.htmll#page=1 (last visited Feb. 10, 2015).

30.     Despite this track record, Anthem failed to encrypt the PII and PHI it stored.  As the Wall Street Journal reported, "Anthem Inc. stored the Social Security numbers of 80 million customers without encrypting them, the result of what a person familiar with the matter described as a difficult balancing act between protecting the information and making it useful." http://www.wsj.com/articles/investigators-eye-china-in-anthem-hack-1423167560 (last visited Feb. 13, 2015).

31.     "When the data is moved in and out of the warehouse, it is encrypted. But when it sits in the warehouse, it's not encrypted, . . ." Anthem spokeswoman Cindy Wakefield said. This decision, to not encrypt data that "sits in the warehouse" is wholly unreasonable, for obvious reasons: such data is valuable and, as discussed below, Anthem was warned specifically about the importance of safeguarding PII and PHI.

## ANTHEM KNEW THAT ITS CUSTOMERS' PII AND PHI WERE LIKELY TO BE TARGETED

32.     Because of the wealth of information stored on their systems healthcare providers, such as Anthem, are aware that they are, and will be, a frequent target of attacks on data security.

33.     According to a report issued by the credit reporting company Experian, "[t]he healthcare industry, by far, will be the most susceptible to publicly disclosed and widely scrutinized data breaches." http://www.experian.com/data-breach/data-breach-industry-forecast.html (last visited Feb. 13, 2015). According to the Indianapolis Star "Security experts knew it was not a matter of whether a major breach would occur in the health-care industry, but when." https://search.yahoo.com/yhs/search;_ylt=A0LEVi9.W95UJJUAKYUnnIlQ?ei=UTF-8&hsimp=yhs001&hspart=mozilla&p=anthem+data+breach+information+more+valuable&Spell State=&fr2=sp-qrw-corr-top.

34.     The New York Times reports that "[t]he threat of a hacking is particularly acute in the health care and financial services industries, where companies routinely keep the most sensitive personal information about their customers on large databases." *See* Reed Abelson & Matthew Goldstein, Millions of Anthem Customers Targeted in Cyberattack, N.Y. TIMES (Feb. 10, 2015), http://www.nytimes.com/2015/02/05/business/hackers-breached-data-of-millions-insurer-says.html.

35.    In fact, the type of data stored by healthcare providers, and stolen as part of the Anthem data breach, is far more valuable to identity thieves than credit card or other PII stolen from retailers or other companies that store customer information. This is because a credit card can be easily cancelled or replaced. A Social Security number cannot.

36.    This information allows thieves to open many financial/banking accounts in victims' names, and in some cases to file fake tax returns in their names -- a common fraud.

37.    "This is absolutely the worst kind of data breach, because thieves have stolen the information that's the most valuable, the most dangerous and impossible to change or cancel," said Neal O'Farrell, Credit Sesame's security and identity theft expert in an email. "This is mass victimization of the worst kind." http://www.indystar.com/story/news/2015/02/05/anthem-data-breach-lifelong-battle-customers/22953623/.

38.    An April 2014 notice from the Federal Bureau of Investigation to health care providers warned companies, including Anthem, about the inadequacies of their systems, given the threats that exist. The notice stated: "[t]he healthcare industry is not as resilient to cyber intrusions compared to the financial and retail sectors, therefore the possibility of increased cyber intrusions is likely." FBI Cyber Division, Private Industry Notification, PIN # 140408-010.

39.    In August, 2014 after a data breach at Community Health, the FBI again warned those in the healthcare industry about the need for increased data protection, saying that it had "observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)." http://www.politico.com/morningcybersecurity/0814/morningcybersecurity15083.html (last visited Feb. 13, 2014).

40.     Anthem admits that its customers' PII was subject to a data breach, and was subsequently obtained by one or more criminals:

> Anthem was the target of a very sophisticated external cyber attack. These attackers gained unauthorized access to Anthem's IT system and have obtained personal information from our current and former members such as their names, birthdays, medical IDs/social security numbers, street addresses, email addresses and employment information, including income data.

http://www.anthemfacts.com/.

41.     Anthem announced that on or about January 29, 2015, it detected a massive data breach that compromised the PII and/or PHI of approximately 80 million insured and former insured.

42.     The Wall Street Journal first broke the news publically of a breach to Anthem's systems. *See* http://www.wsj.com/articles/health-insurer-anthem-hit-by-hackers-1423103720.

43.     On or about February 4, 2015, Anthem issued notice to its insured that they had fallen victim to a data breach stating that "the personal information from our current and former members such as their names, birthdays, member ID/Social Security numbers, street addresses, email addresses and employment information, including income data" had been stolen by hackers.

44.     Anthem is still investigating the data breach, including whether information other than customer and former customer's names, birthdays, member ID/Social Security numbers, street addresses, email addresses and employment information, including income data was accessed during the breach. *See* www.AnthemFacts.com, post dated Feb. 13, 2015.

45.     Anthem is also still investigating when the data breach began, although Anthem believes the breach began in early December 2014, nearly two months before Anthem disclosed the data breach to its customers. *See id.*

46.     According to noted cyber security expert Brian Krebs, the Anthem data breach may have started as far back as April 2014.  "Analysis of open source information on the cybercriminal infrastructure likely used to siphon 80 million Social Security numbers and other sensitive data from health insurance giant Anthem suggests the attackers may have first gained a foothold in April 2014, nine months before the company says it discovered the intrusion." http://krebsonsecurity.com/2015/02/anthem-breach-may-have-started-in-april-2014/ (last visited Feb. 13, 2014.)

47.     According to Krebs,

> [T]he attack on Anthem bear the hallmark of a state-sponsored Chinese cyber espionage group known by a number of names, including "Deep Panda," "Axiom," Group 72," and the "Shell Crew," to name but a few.

> Deep Panda is the name given to this group by security firm CrowdStrike. In November 2014, Crowdstrike published a snapshot of a graphic showing the malware and malicious Internet servers used in what security experts at PriceWaterhouseCoopers dubbed the ScanBox Framework, a suite of tools that have been used to launch a number of cyber espionage attacks. Crowdstrike's snapshot (produced with the visualization tool Maltego) lists many of the tools the company has come to associate with activity linked to Deep Panda, including a password stealing Trojan horse program called Derusbi, and an Internet address — 198[dot]200[dot]45[dot]112.

> CrowdStrike's image curiously redacts the resource tied to that Internet address but a variety of open source records indicate that this particular address was until very recently the home for a very interesting domain: we11point.com. The third and fourth characters in that domain name are the numeral one, but it appears that whoever registered the domain was attempting to make it look like "Wellpoint," the former name of Anthem before the company changed its corporate name in late 2014. Wellpoint[dot]com was registered on April 21, 2014 to a bulk domain registration service in China. Eight minutes later, someone changed the site's registration records to remove any trace of a connection to China.

> Intrigued by the fake Wellpoint domains, Rich Barger, chief information officer for Arlington, Va. security firm ThreatConnect

> Inc., dug deeper into so-called "passive DNS" records — historic records of the mapping between numeric Internet addresses and domain names. That digging revealed a host of other subdomains tied to the suspicious wellpoint[dot]com site. In the process, Barger discovered that these subdomains — including myhr.wellpoint[dot]com, and hrsolutions.wellpoint[dot]com - mimicked components of Wellpoint's actual network as it existed in April 2014.

http://krebsonsecurity.com/2015/02/anthem-breach-may-have-started-in-april-2014/.

48.     Anthem has, to date, failed to individually inform customers of the specific information that has been stolen and has not informed people whether banking information, such as credit or debit card numbers, account numbers of sensitive medical information was stolen as a result of the breach.

49.     Anthem has set up a website at <www.anthemfacts.com> where the data breach was disclosed to Anthem customers by way of a letter from Joseph R. Swedish, President and CEO of Anthem.   This website also provides a short and vague facts page at <www.anthemfacts.com/faq> (last visited Feb. 12, 2015). Instead, Anthem has said that it will begin mailing letters to individuals whose personal information was compromised "in the coming weeks".

50.     Within three days of its announcement of the data breach, Anthem on February 6, 2015, sent out an alert to its customers which stated, in part: "Individuals who may have been impacted by the cyber-attack against Anthem, should be aware of scam email campaigns targeting current and former Anthem members.   These scams, designed to capture personal information (known as 'phishing') are designed to appear as if they are from Anthem and the emails include a 'click here' link for credit monitoring. These emails are NOT from Anthem." The alert from Anthem continued:  "This outreach is from scam artists who are trying to trick consumers into sharing personal data."  Anthem further asserted in the alert that there was no

indication that the scam email campaigns "are being conducted by those that committed the cyber attack." Anthem Press Release (Feb. 6, 2015), http://ir.antheminc.com/phoenix.zhtml?c=130104&p=irol-newsArticle&ID=2014520 (last visited Feb. 11, 2015).

51.     Security expert John Sileo said "So an outgrowth of the Anthem breach, other than having your data stolen, is there are now all of these phishing emails that look very much like an Anthem email that say 'you have the right to have free credit monitoring' or 'restoration services' of some sort," http://www.9news.com/story/money/personal-finance/consumer/2015/02/11/anthem-scam-with-a-scam/23248583/ (last visited Feb. 13, 2015).

52.     The vague and conclusory nature of the information that Anthem provided to its customers to date, and the fact that Anthem has told consumers that it may take up to two weeks for the Company to inform them if there PHI and/or PII was compromised, has lead Attorney's General from 10 states to publically question Anthem's handling of the breach.

53.     In a letter, sent by Connecticut Attorney General George Jepson, on behalf of Attorney's General for Arkansas, Illinois, Kentucky, Maine, Mississippi, Nebraska, Nevada, Pennsylvania and Rhode Island, the officials wrote "As the days pass with no direct communications from Anthem, our offices are receiving more and more communications from constituents expressing greater and greater frustration.  Their frustration is justified."

54.     Anthem's actions have greatly increased the risk that its insured will be imminently targeted by identity thieves.

55.     The Federal Trade Commission describes identity theft as "when someone steals your personal information and uses it without your permission."  Going on to describe it as "a serious crime that can wreak havoc with your finances, credit history, and reputation — and can

13

take time, money, and patience to resolve." http://www.consumer.ftc.gov/features/feature-0014-identity-theft.

56.     According to the FTC "Once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance. An identity thief can file a tax refund in your name and get your refund. In some extreme cases, a thief might even give your name to the police during an arrest." http://www.consumer.ftc.gov/articles/0271-signs-identity-theft.

57.     In the wake of the Anthem data breach, the FTC is recommending that Anthem customers concerned about their data put a "credit freeze" on their identities. A credit freeze, also known as a security freeze, lets you limit access to your credit report, which makes it more difficult for identity thieves to open new accounts in your name. http://www.consumer.ftc.gov/blog/hack-attack-health-insurers-customer-information-stolen. While this may limit the risk of identity theft, it also drastically limits Anthem customers' ability to open credit cards, get mortgage financing, or purchase large ticket items such as cars.

58.     According to the Indiana Attorney General's office "The risk of identity theft is a lot like germs – you can be aware and take precautions but you cannot avoid the risk completely. You can only be smart about the behaviors you use and educate those around you." You cannot, however, control the cavalier actions of your insurance carrier.

59.     As the Minnesota Attorney General has pointed out, in the case of identity theft "it may take a few months, but eventually you'll start getting calls from creditors demanding payment for charges that you never made. A strange bank may call you about an overdrawn account in your name – an account you never opened. Identity theft takes months for you to detect, and sometimes years or longer to unravel."

60.    In May 10, 2006, President Bush established the President's Task Force on Identity Theft ("Task Force"), "recognizing the heavy financial and emotional toll that identity theft exacts from its victims, and the severe burden it places on the economy."

61.    The Task Force's report recognizes that "individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit.  Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration."

62.    The unauthorized disclosure of Social Security numbers can be particularly damaging, because Social Security Numbers cannot easily be replaced. In order to obtain a new number, a person must prove, among other things that he or she continues to be disadvantaged by the misuse.   Thus, no new number can be obtained until after the damage has been done. Furthermore, as the Social Security Administration ("SSA") warns:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.

SSA, Identity Theft and Your Social Security Number, SSA Publication No. 05-10064 (Dec. 2013), *available at* http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Feb. 11, 2015).

63.     As an of example of how serious the resulting injuries from Anthem's failure to protect customers' PII may be, the Connecticut Department of Revenue has issued a warning to Anthem customers to file their income tax returns as soon as possible.

64.     Connecticut Department of Revenue Services Commissioner Kevin Sullivan said "Information apparently hacked at Anthem is exactly what tax fraud thieves use to make false refund claims."

65.     Thanks to Defendants' failure to protect their sensitive information, Plaintiffs and the Class now face years of looking over their financial shoulder, monitoring their credit reports, paying for identity theft protection, and general anxiety about their financial wellbeing.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action pursuant to Indiana law on behalf of themselves and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 defined as follows:

> All persons in the United States whose PII or PHI was stored on the Anthem system, and who have had their PII or PHI information exposed during the security breach, announced on February 4, 2015 and were or may be damaged ("Nationwide Class").

67.     Excluded from the Class are Defendants, any parent, subsidiary or affiliate of Defendants, and any employees, officers, or directors of Defendants legal representatives, successors, or assigns of Defendants and any justice, judge or magistrate judge of the United States who may hear the case, and all persons related to any such judicial officer as defined in 28 U.S.C. §455(b).

68.     Plaintiffs also bring this action pursuant to Wisconsin law on behalf of themselves and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 defined as follows:

> All persons in Wisconsin whose PII or PHI was stored on the Anthem system, and who have had their PII or PHI exposed during

> the security breach, announced on February 4, 2015 and were or
> may be damaged (the "Wisconsin Class").

69. Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants or any employees, officers, or directors of Defendants; legal representatives, successors, or assigns of Defendants; and any justice, judge or magistrate judge of the United States who may hear the case, and all persons related to any such judicial officer, as defined in 28 U.S.C. § 455(b).

70. Plaintiffs also bring this action pursuant to New Jersey law on behalf of themselves and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 defined as follows:

> All persons in New Jersey whose PII or PHI was stored on the
> Anthem system, and who have had their PII or PHI exposed during
> the security breach, announced on February 4, 2015 and were or
> may be damaged (the "New Jersey Class").

71. Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants or any employees, officers, or directors of Defendants; legal representatives, successors, or assigns of Defendants; and any justice, judge or magistrate judge of the United States who may hear the case, and all persons related to any such judicial officer, as defined in 28 U.S.C. § 455(b).

72. **Numerosity**. The Class members are so numerous and dispersed nationwide that joinder of all members is impracticable. Upon information and belief, the Class members number in the tens of millions. The exact number of Class members is unknown, but can be determined from Defendants' computerized and other records. Plaintiffs reasonably estimate and believe that there are millions of persons in the Class.

73. **Commonality**. There are numerous and substantial questions of law and fact that are common to all members of the Class, which predominate over any question affecting only

individual Class members. The members of the Class were and continue to be subjected to the same practices of the Defendants. The common questions and issues raised by Plaintiffs' claims include:

(a)     whether Defendants acted negligently in failing to properly safeguard Class members' financial and personal data;

(b)     whether Defendants' conduct constituted bailment;

(c)     whether Defendants violated industry standards concerning the handling and storage of Class members' financial and personal data;

(d)     whether Defendants failed to notify Class members of the security breach as soon as practical after the breach was discovered;

(e)     whether Defendants engaged in unfair practices by failing to properly safeguard customers' financial and personal data;

(f)     whether Defendants violated The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, et seq.;

(g)     whether Defendants violated The Wisconsin Deceptive Trade Practices Act, W.S.A. § 100.20(1), et seq.;

(h)     whether Plaintiffs and the Class have been damaged, and, if so, what types of damages flowed from Defendants' unlawful conduct; and

(i)     the appropriate measure of damages and remedies against Defendants, and the nature and extent of any other remedies, and injunctive relief, to which Plaintiffs and the Class are entitled.

74.   **Typicality**.  Plaintiffs' claims are typical of the claims of all of the other members of the Class because their claims are based on the same legal and remedial theories as the claims of the Class and arise from the same course of conduct by Defendants.

75.   **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of all members of the Class in the prosecution of this Action and in the administration of all matters relating to the claims stated herein.  Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the Class they seek to represent.  Plaintiffs have retained counsel experienced in handling class action lawsuits.  Neither Plaintiffs nor their counsel have any interest that might cause them not to vigorously pursue this action.

76.   **Superiority**.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy since individual joinder of the Class members is impracticable.  Even if individual Class members were able to afford individual litigation, it would be unduly burdensome to the Courts in which the individual litigation would proceed. Defendants have subjected the Class to the same violations as referenced herein.  Accordingly, class certification is appropriate under Rule 23 because common issues of law and fact regarding Defendants' uniform violations predominate over individual issues, and class certification is a superior method of resolving these claims.  No unusual difficulties are likely to be encountered in the management of this action as a class action.  Defendants acted and continue to act in a manner that is generally applicable to all members of the Class, making final injunctive relief appropriate.

## COUNT I

### NEGLIGENCE
**(On Behalf of the "Nationwide Class," Pursuant to Indiana Law)**

77.     Plaintiffs fully incorporate by reference herein all of the above paragraphs, as though fully set forth herein.

78.     Anthem owed a duty to Plaintiffs and members of the Class to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting their personal, health, and financial information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.   This duty included, among other things, designing, maintaining, and testing Anthem's security systems to ensure that Plaintiffs' and Class members' personal, health, and financial information in Anthem's possession was adequately secured and protected.  Anthem further owed a duty to Plaintiffs and Class members to implement processes that would detect a breach of its security system in a timely manner and to timely act upon warnings and alerts.

79.     Anthem owed a duty, as articulated in Anthem's HIPAA Notice of Privacy Practices handbook, to protect its customers' sensitive financial, health, and personal information.

80.     Anthem owed a duty to timely disclose the material fact that Anthem's computer systems and data security practices were inadequate to safeguard customers' personal and financial data from theft.

81.     Anthem breached these duties by the conduct alleged in the Complaint by, including without limitation, (a) failing to protect its customers' personal, financial, and health information; (b) failing to maintain adequate computer systems and data security practices to safeguard customers' personal, health, and financial information; (c) failing to disclose the

material fact that Anthem's computer systems and data security practices were inadequate to safeguard customers' personal and financial data from theft; and (d) failing to disclose in a timely and accurate manner to Plaintiffs and members of the Class the material fact of the Anthem data breach.

82.    The conduct alleged in the Complaint caused Plaintiffs and Class members to be exposed to fraud and be harmed. The injuries suffered by the Plaintiffs and the proposed Class as a direct result of the Anthem data breach include: theft of their personal and financial information; costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts; costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the Anthem data breach; the imminent and certainly impending injury flowing from potential fraud and identify theft posed by their personal and financial information being placed in the hands of hackers; damages to and diminution in value of their personal and financial information entrusted to Anthem for the sole purpose of obtaining health insurance from Anthem and with the mutual understanding that Anthem would safeguard Plaintiffs' and Class members' data against theft and not allow access and misuse of their data by others; money paid to Anthem for health insurance during the period of the Anthem data breach in that Plaintiffs and Class members would not have obtained insurance from Anthem had Anthem disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' financial and personal information and had Anthem provided

timely and accurate notice of the Anthem data breach; overpayments paid to Anthem for health insurance purchased during the Anthem data breach in that a portion of the price for insurance paid by Plaintiffs and the Class to Anthem was for the costs of Anthem providing reasonable and adequate safeguards and security measures to protect customers' financial and personal data, which Anthem did not do, and as a result, Plaintiffs and members of the Class did not receive what they paid for and were overcharged by Anthem; and continued risk to their financial and personal information, which remains in the possession of Anthem and which is subject to further breaches so long as Anthem fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' data in its possession.

**COUNT II**

**BREACH OF IMPLIED CONTRACT**
**(On Behalf of the "Nationwide Class," Pursuant to Indiana Law)**

83.     Plaintiffs incorporate by reference those paragraphs set out above as if fully set forth herein.

84.     When Plaintiffs and members of the Class provided their financial, health, and personal information to Anthem in order to purchase health insurance from Anthem, Plaintiffs and members of the Class entered into implied contracts with Anthem pursuant to which Anthem agreed to safeguard and protect such information and to timely and accurately and individually notify Plaintiffs and Class members that their data had been breached and compromised.

85.     Plaintiffs and Class members would not have provided and entrusted their financial, health, and personal information to Anthem in order to purchase health insurance from Anthem in the absence of the implied contract between them and Anthem.

86.     Plaintiffs and members of the Class fully performed their obligations under the implied contracts with Anthem.

22

87.     Anthem breached the implied contracts it made with Plaintiffs and Class members by failing to safeguard and protect the personal, health, and financial information of Plaintiffs and members of the Class and by failing to provide timely and accurate notice to them that their personal and financial information was compromised in and as a result of Anthem data breach.

## COUNT III

### BREACH OF CONTRACT
### (On Behalf of the "Nationwide Class," Pursuant to Indiana Law)

88.     Plaintiffs incorporate by reference those paragraphs set out above as if fully set forth herein.

89.     Anthem has a contractual obligation to maintain the security of its customers' personal, health, and financial information, which Anthem itself recognizes in its HIPAA Notice of Privacy Practices handbook where it addresses the consumers "protected health information" or "PHI":

- "We keep the health and financial information of our current and former members private, as required by law, accreditation standards and our rules."

- "We are dedicated to protecting your PHI, and have set up a number of policies and practices to help make sure your PHI is kept secure. We keep your oral, written and electronic PHI safe using physical, electronic, and procedural means. These safeguards following federal and state laws. Some of the ways we keep your PHI safe include securing offices that hold PHI, password Protecting computers, and locking storage areas and filing cabinets. . . ."

90.     Anthem breached these contractual obligations by failing to safeguard and protect the personal, health, and financial information of Plaintiffs and members of the Class and by

failing to provide timely and accurate notice to them that their personal and financial information was compromised in and as a result of the Anthem data breach.

91.     The losses and damages sustained by Plaintiffs and Class members as described herein were the direct and proximate result of Anthem's breaches of the contracts between Anthem and Plaintiffs and members of the Class.

**COUNT IV**

**BAILMENT**
**(On Behalf of the "Nationwide Class," Pursuant to Indiana Law)**

92.     Plaintiffs fully incorporate by reference herein all of the above paragraphs, as though fully set forth herein.

93.     Plaintiffs and Class members delivered and entrusted their PHI and PII to Anthem for the sole purpose of receiving services from Anthem.

94.     In delivering their PHI and PII to Anthem, Plaintiffs and Class members intended and understood that Anthem would adequately safeguard their personal and financial information.

95.     Anthem accepted possession of Plaintiffs' and Class members' PHI and PII. By accepting possession, Anthem understood that Plaintiffs and Class members expected Anthem to adequately safeguard their personal and financial information. Accordingly, a bailment was established for the mutual benefit of the parties.

96.     During the bailment, Anthem owed a duty to Plaintiffs and Class members to exercise reasonable care, diligence and prudence in protecting their PHI and/or PII.

97.     Anthem breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiffs' and Class members' PHI and/or PII, resulting in the unlawful and unauthorized access to and misuse of such information.

24

98.     Anthem further breached its duty to safeguard Plaintiffs' and Class members' PHI and/or PII by failing to timely and accurately notify them individually that their information had been breached and compromised.

99.     As a direct and proximate result of Anthem's breach of its duty, Plaintiffs and Class members suffered consequential damages that were reasonably foreseeable to Anthem, including but not limited to the damages set forth above.

## COUNT V

### UNJUST ENRICHMENT
**(On Behalf of the "Nationwide Class," Pursuant to Indiana Law)**

100.     Plaintiffs fully incorporate by reference herein all of the above paragraphs, as though fully set forth herein.

101.     Plaintiffs and Class members conferred a monetary benefit on Anthem in the form of monies paid for the purchase of health services from Anthem during the period of the data breach.

102.     Anthem appreciates or has knowledge of the benefits conferred directly upon it by Plaintiffs and members of the Class.

103.     The monies paid for the purchase of health services by Plaintiffs and members of the Class to Anthem during the period of the data breach were supposed to be used by Anthem, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiffs and members of the Class.

104.     Anthem failed to provide reasonable security, safeguards and protection to the PHI and/or PII of Plaintiffs and Class members and as a result, Plaintiffs and Class members overpaid Anthem for the services purchased.

25

105.    Under principles of equity and good conscience, Anthem should not be permitted to retain the money belonging to Plaintiffs and members of the Class, because Anthem failed to provide adequate safeguards and security measures to protect Plaintiffs' and Class members' PHI and PII that they paid for but did not receive.

106.    Plaintiffs and the Class have conferred directly upon Anthem an economic benefit in the nature of monies received and profits resulting from sales and unlawful overcharges to the economic detriment of Plaintiffs and the Class members.

107.    The economic benefit, including the monies paid and the overcharges and profits derived by Anthem and paid by Plaintiffs and members of the Class, is a direct and proximate result of Anthem's unlawful practices as set forth in this Complaint.

108.    The financial benefits derived by Anthem rightfully belong to Plaintiffs and members of the Class.

109.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Anthem traceable to Plaintiffs and the Class.

110.    Plaintiffs and the Class have no adequate remedy at law.

## COUNT VI

**Violation of New Jersey Consumer Fraud Act, N.J. Stat. 56:8-1, et seq. (On Behalf of the "New Jersey Class")**

111.    Plaintiffs fully incorporate by reference herein all of the above paragraphs, as though fully set forth herein.

112.    By the acts and omissions set forth herein, Defendants have violated security breach notification laws of New Jersey.

113.    The New Jersey law, N.J. Stat. 56:8-163 specifically provides that:

Any business that conducts business in New Jersey ... shall disclose any breach of security of those computerized records following discovery or notification of the breach to any customer who is a resident of New Jersey whose personal information was, or is reasonably believed to have been, accessed by an unauthorized person. The disclosure to a customer shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subsection c. of this section, or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system....

N.J. Stat. 56:8-163.

114.    As described in detail above, Defendants failed to comply with these statutory requirements, and similar requirements under other States' laws by, inter alia, failing to disclose "in the most expedient time possible aid without unreasonable delay."

115.    Because New Jersey provides that violations of the foregoing statutes constitute unlawful practices within the meaning of the New Jersey consumer fraud law, the foregoing acts and failures to act by Defendants constitute per se violations of New Jersey law.

116.    By the misrepresentations and non-disclosure of material facts alleged above, the Defendants deceived and continue to deceive consumers, such as Plaintiffs and the Class. This conduct constitutes unconscionable, unlawful, unfair, deceptive and/or fraudulent business practices within the meaning of the New Jersey Consumer Fraud Act, 56:8-1, et seq.

117.    As a direct and proximate result of the Defendants unfair and deceptive trade practices, Plaintiffs and the Class have and will continue to suffer damages in an amount to be determined at trial.

## COUNT VII

**Violation of The Wisconsin Deceptive Trade Practices Act, Wis. Stat.§ 100.20(1), et seq.**

118.    Plaintiffs fully incorporate by reference herein all of the above paragraphs, as though fully set forth herein.

119.   Wis. Stat. § 100.18(1) prohibits any person or company from "sell[ing], distribut[ing], increas[ing] the consumption of or in any way dispos[ing] of any . . . merchandise . . . or anything offered by such person [or company]" by making, publishing, disseminating, circulating, or placing before the public "an advertisement, announcement, statement or representation of any kind to the public relating to [the product]" which is "untrue, deceptive, or misleading."

120.   A representation to the public might be to one or more people and is untrue if it is false, erroneous, or does not state or represent things as they are. A representation is deceptive or misleading if it causes a reader or listener to believe something other than what is in fact true or leads to a wrong belief. This does not require the advertiser to know that a claim is false or has intent to defraud or deceive.

121.   Defendants' representations placed Defendants' insurance services before the public without disclosing that they did not adequately protect consumers PII and PHI, and constitutes of an advertisement, announcement, statement or representation within the meaning of Wis. Stat. § 100.18.

122.   Defendants' above-described representations, occurred within the three years preceding the filing of this Complaint, and are untrue, deceptive, or misleading misrepresentations and omissions in violation of Wis. Stat. § 100.18.

123.   Defendants made the misrepresentations complained of herein with the intent to increase the consumption of, the sale of, the use of, the distribution of, or to induce the public to purchase Defendants' insurance throughout Wisconsin.

124.   Defendants' misrepresentations regarding the quality of their data security procedures have the capacity and are likely to deceive the average consumer and have deceived numerous customers.

125.   Absent Defendants' deceptive and misleading representations, Plaintiffs and the other members of the Class would have acted otherwise. For instance, they would not have been induced to purchase, nor would they have purchased the Defendants' insurance; they would have chosen to buy competing products or services.

126.   Due to Defendants' deceptive and misleading representations, Plaintiffs and other members of the Class suffered the loss of the benefit of their bargain when purchasing health insurance.

127.   Because of Defendants' deceptive and misleading representations, Plaintiffs and the other members of the Class have suffered pecuniary loss, which is calculated to be the difference in value of the price paid and the price or value of what was represented and what consumers reasonably believe to be receiving as a benefit of the bargain.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs Ames and Bader, on behalf of themselves and the Class, request the following relief:

A.   An order certifying that this action is properly brought and may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed as Class Representative, and that Plaintiffs' counsel be appointed Class Counsel;

B.   An award of damages;

C.   Restitution of all monies unjustly obtained or to be obtained from Plaintiffs and members of the Class;

D.     Disgorgement of revenues obtained by Defendants as a result of the misconduct alleged herein;

E.     Declaratory and injunctive relief;

F.     An award of reasonable attorneys' fees and costs; and

G.     Such other relief at law or equity as this court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demands trial of their claims by jury to the extent authorized by law.

Dated:  March 20, 2015                        Respectfully submitted:

By:_____
Irwin B. Levin, No. 8786-49
Richard E. Shevitz, No. 12007-49
Scott D. Gilchrist, No. 16720-53
Vess A. Miller, No. 26495-53
Lynn A. Toops, No. 26386-49A
**Cohen & Malad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN  46204
317-636-6481
317-472-6720 (fax)
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com
vmiller@cohenandmalad.com
ltoops@cohenandmalad.com

**MILBERG LLP**
Ariana J. Tadler
Andrei V. Rado
John Seredynski
Adam Bobkin
One Pennsylvania Plaza
49th Floor
New York, New York  10119
Telephone:  (212) 594-5300
Facsimile:  (312) 346-0022
atadler@milberg.com
arado@milberg.com
jseredynski@milberg.com

abobkin@milberg.com

**LAW OFFICES OF PAUL C. WHALEN, P.C.**
Paul C. Whalen (PW1300)
768 Plandome Road
Manhasset, NY 11030
Telephone: (516) 426-6870
Facsimile: (212) 658-9685

**JONES WARD PLC**
Jasper D. Ward IV (92160KY)
Alex C. Davis (94899KY)
Marion E. Taylor Building
312 South Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Telephone: (502) 882-6000
Facsimile: (502) 587-2007
jasper@jonesward.com
alex@jonesward.com

*Co-Counsel for Plaintiffs*